**FEDERAL DEPOSIT INSURANCE CORPORATION**

v.

Gus S. MIJALIS et al.

Civ. A. No. 89–1316.

United States District Court,
W.D. Louisiana,
Shreveport Division.

June 30, 1992.

Judy Y. Barrasso, Barry W. Ashe, Sarah S. Vance, Stephen G. Bullock and Karen H. Freese, Stone, Pigman Law Firm, New Orleans, La., for F.D.I.C.

Joe C. Lesage Jr. and John D'Anna, Booth, Lockard Law Firm, Shreveport, La., for Gus S. Mijalis, Alex S. Mijalis and John G. Cosse.

Paul M. Cooke, Simon, Fitzgerald, Cooke Law Firm, Shreveport, La., for J. Harper Cox Jr. and John B. Franklin.

James Russell Lewis, Phillip Wesley Pries, Catherine S. St. Pierre, Dana L. Reneau, Preis & Crawford, Baton Rouge, La., for Intern. Ins. Co.

## MEMORANDUM RULING

STAGG, Senior District Judge.

This case was tried before a jury from November 5 to December 11, 1991. The jury found that the individual director and officer defendants were grossly negligent in approving and funding certain loans made by the Bank of Commerce. The sole issue now to be decided is the amount available to pay the jury's verdict from the coverage provided by the two policies issued by International Insurance Company.[1] The parties have submitted a series of combative and argumentative briefs which, with attached appendices, forms an eight-inch stack on my desk.

## A. THE FACTS

In 1986, the Comptroller of the Currency of the United States declared the Bank of Commerce ("BOC" or "the Bank") insolvent and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver. The FDIC–Receiver later assigned to FDIC–Corporate all of its rights in various claims, including claims the FDIC believed it possessed against former officers and directors of BOC. Those claims are the subject of this suit.

The complaint alleged that the directors and officers breached a fiduciary duty owed to the Bank, breached their contract with the Bank and negligently carried out their duties to the Bank. International Insurance Company ("International") was named a defendant pursuant to the Louisiana Direct Action Statute. International issued directors and officers liability and corporate reimbursement insurance policies to BOC which allegedly provide coverage for the acts alleged in the complaint. There are two insurance policies at issue: first, Directors and Officers Liability and Company Reimbursement Policy No. FDO8874 ("1983 policy"), allegedly cover-

---

1. The Jury Interrogatories are attached as Appendix "A."

ing claims from February 21, 1981 to January 1, 1984; and, second, Directors and Officers Liability and Company Reimbursement Policy No. 524–033127–9 ("1984 policy"), allegedly covering claims from January 1, 1984 to January 1, 1985. The coverage at issue under both policies concerns directors and officers liability, not company reimbursement liability.

## THE INSURANCE POLICIES

The relevant policy portions are:

### 1. INSURING CLAUSE

If during the policy period any claim or claims are made against the Insureds (as hereinafter defined) or any of them for a Wrongful Act (as hereinafter defined) while acting in their individual or collective capacities as Directors or Officers, the Insurer will pay on behalf of the Insureds or any of them, their Executors, Administrators, Assigns 95% of all Loss (as hereinafter defined), which the Insureds or any of them shall become legally obligated to pay, in excess of the retentions stated in Item IV(a) and (b) of the Declarations, not exceeding the limit of liability stated in Item III of the Declarations.

\* \* \* \* \* \*

### 9. LOSS PROVISIONS

If during the policy period or extended discovery period:

(a) The Company or the Insureds shall receive written or oral notice from any party that it is the intention of such party to hold the Insureds responsible for the results of any specified Wrongful Act done or alleged to have been done by the Insureds while acting in the capacity aforementioned; or

(b) The Company or the Insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such alleged Wrongful Act;

and shall in either case during such period give written notice as soon as practicable to the Insurer of the receipt of such written or oral notice under Clause 9(a) or of such occurrence under Clause 9(b), then any claim which may subsequently be made against the Insureds arising out of such alleged Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given or if given during the extended discovery period as a claim made during such extended discovery period.

The Company or the Insureds shall, as a condition precedent to the Insureds' right to be indemnified under this policy, give to the Insurer notice in writing as soon as practicable of any claim made and shall give the Insurer such information and cooperation as they may reasonably require and as shall be in the Insureds' power.

For the purpose of the above clauses notice to that individual named in Item VII of the Declarations shall constitute notice to the Company or the Insureds.

### 10. In the event of any claim occurring hereunder, the person or firm(s) as named in Item VIII of the Declaration shall be given notice on behalf of the Insurers.

The insurance policies provide that coverage exists under the "insuring" clause if a *claim* is made against the insured. The "loss provisions" clause governs situations in which the insured or BOC has been made aware of possible liability stemming from specific acts or occurrences. Written notice would be required to the insurer during the policy period "as soon as practicable" if the company or the insured received written or oral notice from a party of an intent to hold them responsible.

In this suit, the FDIC has brought its claim against International pursuant to Louisiana's Direct Action Statute ("LDAS"). La.Rev.Stat. 22:655. The policies at issue are the directors and officers liability policies, not the company's reimbursement liability policies. The policies at issue concern contracts of liability, not indemnity. The LDAS applies to every "policy or contract of liability insurance." La.

Rev.Stat. 22:655. *See also Quinlan v. Liberty Bank & Trust Co.*, 575 So.2d 336 (La.1990). The LDAS is applicable to the FDIC's claims against International. "It has long been the recognized public policy of [Louisiana] that a policy of liability insurance is issued for the protection of the general public as well as for the security of the insured." *White v. State Dept. of Public Safety & Corrections, etc.*, 569 So.2d 1001, 1003 (La.App. 1 Cir.1990), *citing Hughes v. Southeastern Fidelity Ins. Co.*, 340 So.2d 293 (La.1976); *West v. Monroe Bakery, Inc.*, 217 La. 189, 46 So.2d 122 (1950).

■ The FDIC's [2] rights arise out of the LDAS. "Thus, the policy terms do not control the scope and nature of the injured third party's rights. The third party's rights under the statute vest at the time of injury, whereas the rights of the insured remain subject to conditions in the policy that arise subsequent to the injury, such as the requirement of notice." *Auster Oil & Gas, Inc. v. Stream*, 891 F.2d 570, 578 (5th Cir.1990). An insurer may not raise the nonprejudicial failure of its insured to give notice of accident or suit as a valid defense to claims of injured third parties. *See Gulf Island, IV v. Blue Streak Marine, Inc.*, 940 F.2d 948 (5th Cir.1991); *Jackson v. Transportation Leasing Co.*, 893 F.2d 794 (5th Cir.1990); *Chennault v. Dupree*, 398 So.2d 169 (La.App. 3d Cir.1981); *Miller v. Marcantel*, 221 So.2d 557, 559 (La.App. 3d Cir.1969).

International's policy provision, "loss provisions," requiring written notice to the insurer of acts or occurrences within the policy period which may give rise to claims is unenforceable against the FDIC, as the FDIC is a third party. International has not proven prejudice from lack of timely notice.

## COVERAGE

■ To establish a prima facie case that coverage exists under the policies, the FDIC must have alleged that a claim was made against the insured, or that notice was given of a specified wrongful act or occurrence to the company or the insured. The FDIC argues that claims were made during the policy period. In support of this assertion, the FDIC has filed numerous documents wherein the FDIC advises officers and directors that they must take steps to correct various deficiencies in lending practices identified by the FDIC.

The term "claim" is not defined in International's policies. Under Louisiana law, an insurance policy is a contract and the words used in a contract "are to be understood in the common and usual signification, without attending so much to grammatical rules as the general and popular use." *Harmon v. Lumbermens Mutual Casualty Company*, 247 La. 263, 170 So.2d 646, 651 (1965); La.Civ.Code art. 2047; *Sharp v. Federal Sav. & Loan Ins. Corp.*, 858 F.2d 1042, 1044 (5th Cir.1988); *Jensen v. Snellings*, 841 F.2d 600, 616 (5th Cir. 1988). The term "claim," as used in the policies, means a demand on the insured by a third party for the performance of some act which the third party has a legal right to require. *See FDIC v. Lensing*, 89–0013 (W.D.La., Shreveport Division) (Report and Recommendation, March 20, 1990).[3]

---

**2.** The FDIC has asserted claims against the directors and officers of the BOC in its corporate capacity as assignee of the FDIC–Receiver's rights. The FDIC represents the failed bank's shareholders, itself as a creditor, and all previous creditors of BOC.

**3.** In the Report and Recommendation issued by Magistrate Judge Roy S. Payne and adopted by this court on July 23, 1990, it was stated:

A claim is a "demand of a right or a supposed right.... a calling on another for something due or supposed to be due." Webster's *Third New International Dictionary*, 414 (3d Ed. Unabridged 1968). *Black's Law Dictionary* de-

fines claim as "to demand as one's own or as one's right; to assert; to urge; to insist.... right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." *Black's Law Dictionary*, 128 (5th Ed.1979).

No Louisiana cases defining "claim" have been cited by the parties and this Court's research has located none. In situations such as this, "cases from other jurisdictions will be relevant because '[t]he law of insurance is the same in Louisiana as in other states.'". *Calca-*

## THE "1983 POLICY"

On March 26, 1981, at a special board meeting, the directors signed and entered into a memorandum of understanding ("MOU") with the FDIC. The MOU provided a time frame during which the Board of Directors was to formulate a plan to improve the Bank's liquidity, and the Board, on behalf of the Bank, was to review the current written investment policy, reduce the total amount of net loans, reduce the concentration of credit, and eliminate and/or correct all violations of laws and regulations as of January 16, 1981. A January 29, 1982 letter by the FDIC to the Board of Directors indicates that the Bank was complying with the MOU in some areas; however, additional improvements were obviously in need. The letter requested that serious efforts by the Board be made to avoid concentrations of credit and correct present violations and implement procedures to prevent reoccurrence. The liquidity position of the Bank was still found to be unsatisfactory.

A May 5, 1982 letter was sent to the Bank's Board of Directors by the FDIC stating that the Bank's liquidity continued to be critical and demanding corrective action by the Board. The Board was reminded of its responsibility to comply with the outstanding MOU. The FDIC again demanded corrective action by the Board in letters dated August 19, 1982; February 1, 1983; March 31, 1983 (this letter threatened civil money penalties if good faith corrective actions were not commenced); and April 1, 1983. On June 15, 1983, a Notice of Charges and of Hearing concerning a Cease and Desist Order was sent to the Board. This notice attacked the operations of the Bank and, in Section 3(g), stated, "[t]he Bank's board of directors has failed to provide adequate supervision over the active officers of the Bank to prevent the above described unsafe or unsound banking practices and violations of regulations." On October 5, 1983, a Cease and Desist order was issued by the FDIC to the Bank of Commerce, ordering the Bank, its directors, officers, employees, agents and others to cease and desist in unsafe and unsound banking practices. The Cease and Desist order required affirmative action from the directors and officers.

The "1983 policy" states "LIMIT OF LIABILITY: $10,000,000 each policy year and this shall be the combined limit for both policy forms CFD-1 and CFD-2 which are attached hereto and for part hereof." The 1983 policy defines the term policy year as, "the period of one year following the effective date and hour of this policy or any anniversary thereof, or if the time between the effective date or any anniversary and the termination of the policy is less than one year, such lesser period."

The jury found that neither the amendment increasing the insurance coverage to $10 million per policy year under the 1983 policy, nor that the amendment removing the classified loan exclusion were induced by a material misrepresentation by the directors and officers of the BOC.[4] These amendments, therefore, validly rendered the prior provisions null and void.

The "1983 policy" covered the individual director and officer defendants for three years, 1981–83, in the amount of $10 million per year. The jury determined that

sieu–Marine Nat. Bank v. American Employers' Ins. Co., *533 F.2d 290, 295 (5th Cir.)* cert. denied, *429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) (citations omitted). After an exhaustive, and exhausting, survey of the numerous cases which define "claim," the Court is convinced that the term "claim" as used in the policy at Bar means a demand on the insured by a third party for the performance of some act which the third party has a legal right to require.* See John Hancock Health Plan of Pennsylvania, Inc. v. Lexington Insurance Company, *No. 88–2308 [1989 WL 106992] (E.D.Pa. Sept. 11, 1989);* Insurance Corporation of America v. Dillon, Hardamon & Cohen, *725 F.Supp. 1461 (N.D.Ind.1988);* Evanston Insurance Company v. Security Assur. Company, *715 F.Supp. 1405 (N.D.Ill. 1989);* Safeco Title Insurance Co. v. Gannon, *54 Wash.App. 330, 774 P.2d 30, 33 (1989) (citing cases);* Marion v. National Casualty Co., *431 N.W.2d 370, 373 (Iowa 1988) (citing cases);* Chalk v. Trans Power Mfg., Inc., *153 Wis.2d 621, 451 N.W.2d 770 (App.1989) (citing cases).*

This court remains of the opinion that this analysis and result is correct and applicable to the present case.

**4.** *See* Jury Interrogatories No. 21 and 23.

$17,504,946 of the damages suffered by plaintiff were attributable to the years 1981–83. This $17,504,946 reflects loan losses resulting from the particular conduct proscribed by the FDIC in its demands for correction action by the directors and officers of the Bank. International is, therefore, pursuant to the "1983 policy," liable for $17,504,946 for losses caused by the gross negligence of the individual director and officer defendants, the insured.

## THE "1984 POLICY"

International contends that the 1984 policy does not provide coverage for various reasons. The substantial difference between the 1983 and the 1984 policies centers upon the policy reduction of coverage to $5 million per policy year and exclusionary provisions which were contained in the 1984 policy.

On January 20, 1984, a special meeting of the Board of Directors was held at which the FDIC's representative stated that affirmative action by the Board was still necessary in respect to the Bank's operations and lending practices. In a March 30, 1984 letter from the Louisiana Commissioner of Financial Institution to the Board of Directors of the Bank, corrective action was demanded, in that the classified assets had increased to an unacceptable level, an inadequate loan loss reserve existed, there were nonexistent earnings and the liquidity ratio was also unacceptable. The letter demanded corrective action by the Board and Management to prevent further deterioration; these matters were to be given priority. Corrective action by the Board was further demanded in letters from the FDIC, dated April 17, 1984 and April 26, 1984.

It is clear that numerous claims were made by the FDIC upon the Board of Directors and Management of the BOC. Nevertheless, International contends that even if these claims were made, coverage does not exist pursuant to the regulatory/insolvency exclusion contained in the 1984 policy. This provision excludes all claims arising out of insolvency or financial impairment of the Bank made by, or on behalf of, any federal governmental agency.[5] The FDIC is acting not only on its own behalf but also as representative of the failed bank's depositors and other creditors as well as shareholders. It is unclear whether this exclusion was intended to apply to the FDIC when acting in multiple capacities, particularly a representative capacity. A clearly worded regulatory exclusion, which would unmistakably exclude coverage for claims made by the FDIC in their present capacity, is not present in the instant case.

It is well settled law that "a court applying Louisiana law should interpret a policy according to its plain meaning and not distort its meaning to introduce an ambiguity." *Heinhuis v. Venture Assoc., Inc.*, 959 F.2d 551, 553 (5th Cir.1992) (citations omitted). A policy provision capable of more than one reasonable interpretation, however, is considered ambiguous. "Louisiana courts have held that an insurer has the duty to express clearly the exclusions to its insuring agreements, for exclusion provisions are strictly construed against the insurer, especially if they are of uncertain import." *Scarborough v. Travelers Insurance Company*, 718 F.2d 702, 707 (5th Cir.1983) (citations omitted). This regulatory exclusion provision is ambiguous as applied to the FDIC in this situation and, therefore, it must be construed in favor of the insured in providing coverage.

---

**5.** This exclusionary provision, in its entirety, provides:

In consideration of the premium charged, it is further understood and agreed that the insurer shall not incur any obligation under the terms and conditions of this policy for, or on account of, any claim:

1. Arising out of, based upon or related to:

A. The insolvency of the company named in Item 1 of the declarations; or

B. Financial impairment of the company named in Item 1 of the declarations; or

C. Any action, ruling or intervention of any federal, state or local governmental agency of office;

2. Made by, or on behalf of, any federal, state or local governmental agency of office.

■ International next contends that the insured versus insured exclusion is enforceable and not void as against public policy. The FDIC and the individual director and officer defendants contend that this exclusion is ambiguous. This exclusion provides:

> In consideration of the premium charged, it is hereby agreed that the insurer shall not be liable to make any payment for loss in connection with any claim or claims made against the insureds by an insured or insureds as defined in this policy, including the company named in Item 1 of the declarations except for stockholders' derivative actions brought by a shareholder of the company other than an insured.

Although the Bank is not an insured as defined by the policy, it is included with the insureds for purposes of this clause under the strict language contained within the clause. The clause, however, expressly excludes claims concerning stockholder derivative actions brought by a shareholder of the company other than an *insured*. The FDIC is bringing this suit, in part, as representative of the BOC in the nature of a stockholder's derivative action. This provision is ambiguous as to in whether it excludes this type of lawsuit. *See also Federal Deposit Ins. Corp. v. National Union Fire Insurance Co. of Pittsburgh*, 630 F.Supp. 1149 (W.D.La.1986); *American Casualty Co. v. Baker*, 758 F.Supp. 1340 (C.D.Cal.1991); *Fidelity and Deposit Co. v. Zandstra*, 756 F.Supp. 429 (N.D.Cal. 1990); *American Casualty Co. v. Federal Savings & Loan Insurance Corp.*, 704 F.Supp. 898 (E.D.Ark.1989). *Cf. FDIC v. Zaborac*, 773 F.Supp. 137 (C.D.Ill.1991); *see also Gary v. American Casualty Co.*, 753 F.Supp. 1547 (W.D.Okla.1990); *American Casualty Co. v. Federal Deposit Ins. Corp.*, 677 F.Supp. 600 (N.D.Iowa 1987). Ambiguous terms must be construed in favor of the insured; this exclusion may not be used to prevent coverage. *See Scarborough*, 718 F.2d at 707.

■ International further asserts that coverage does not exist under the "prior acts" clause, contending that if the court finds coverage under the 1983 policy, there can be no coverage under the 1984 policy. In the 1984 policy, "§ 5 exclusions" provides that the insurer shall not be liable for losses insured by any other existing valid policy under which payment of loss is actually made, or for losses which the insureds are entitled to indemnity and/or payment as notice of a circumstance giving rise to a claim has already been given prior to the issue of this policy. This provision merely prevents double recovery. It provides that those acts giving rises to claims which are covered by the 1983 policy may not be also recovered for under the 1984 policy. No double recovery exists here.

■ Next, International contends that the Bank misrepresented to International that it had no claims as of the date of the issuance of the 1984 policy and, therefore, that the 1984 policy should be rescinded. International's policy does not define the term "claim." The director's and officer's misinterpretation of the term is not unreasonable. It is obvious by the terms and conditions of the second policy that International was aware of the problems facing the Bank. It cannot, therefore, be stated that the failure of the directors and officers to list specifically the claims facing them was a material misrepresentation; the renewal application for the 1983 policy, dated December 29, 1983, contained a statement that a cease and desist order had been issued, along with copies of the Bank's June and September 1983 Call Reports. The 1984 policy clearly was not based upon a material representation by any of BOC's officers and directors.

■ Finally, International claims that coverage is precluded under the 1984 policy because of the classified loan exclusion, which stated:

> It is hereby understood and agreed that the Insurer shall not be liable to make any payment for loss in connection with any claim made against the Insured's/Directors or Officers for or arising out of the granting of any loan which shall be deemed classified by any regulatory body or authority.

This exclusion is clear and unambiguous, as required by Louisiana law. *See Scarborough,* 718 F.2d at 702. The jury found that the following amounts of loan losses were attributable to grossly negligent acts or omissions of the defendants occurring during 1984:

| Amount | Loan |
| --- | --- |
| $ 259,328 | Artex Finance Corporation |
| $ 223,365 | Carney, Inc. |
| $3,504,431 | Gay/Ellerbe Road |
| $ 737,952 | 554 Kings Highway |
| $1,588,295 | MEC |
| $ 37,294 | R.A. Oxenrider |
| $2,047,548 | Pounders–Cloyd |
| $2,316,567 | Ricou Brewster |
| $ 241,168 | John F. Wolcott |

The above listed loans were all subsequently deemed classified by the FDIC and, thus, are excluded from coverage by the express terms of the 1984 policy. The classified loan provision clearly excludes loans which are subsequently classified by the FDIC. This court finds that the classified loan exclusion was timely asserted by International.

■ The FDIC claims that the classified loan exclusion is contrary to public policy. "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356–57, 51 S.Ct. 476, 477, 75 L.Ed. 1112 (1931). The FDIC has failed to establish that this exclusion is in contravention of public policy. The classified loan exclusion is not ambiguous, nor is it void and unenforceable as against public policy.

■ The FDIC contends that even if coverage is precluded under the 1984 policy provisions, then coverage may still exist if the court allows the FDIC to exercise a discovery provision contained in the 1983 policy or if reformation of the 1984 policy is allowed. The FDIC argues that the 1984 policy was not a renewal of the 1983 policy and, therefore, International's "non-renewal" of the 1983 policy entitles the FDIC to elect to exercise the discovery option under the 1983 policy. The discovery option would allow the coverage provided by the 1983 policy to be extended for an additional 12 months, *i.e.,* from January 1, 1984 to January 1, 1985. The Discovery Clause of the 1983 policy provides:

If the Insurer shall cancel or refuse to renew this policy, the Company shall have the right, upon payment of an additional premium calculated at 10% of the three-year premium hereunder, to an extension of the cover granted by this policy in respect of any claim or claims which may be made against Directors or Officers during the period of ninety (90) days after the effective date of such cancellation or in the event of such refusal to renew, the date upon which the policy period ends, but only in respect of any wrongful act committed before such date. Such right hereunder must, however, be exercised by the Company by notice in writing not later than ten (10) days after the date referred to ion the preceding sentence. If such notice is not given the Company cannot at a later date be able to exercise such right.

In *Continental Casualty Co. v. Allen,* 710 F.Supp. 1088 (N.D.Tex.1989), a case relied upon by the FDIC and individual director and officer defendants, the Court found that a subsequent policy was in fact a nonrenewal and, therefore, the discovery option of the previous policy could still be invoked. The distinguishing feature in *Continental Casualty Co.* is the policy clause in that case which required the insurance company to give at least 30 days' notice of nonrenewal to the Bank. International's 1983 policy does not contain such a notice requirement within the discovery clause. Furthermore, the Court in *Continental Casualty Co.* stated that "[w]ritten notice, including the reason for non-renewal, is also usually required." *Id* at 1100 n. 25, *citing* Tex.Ins.Code art. 21.49–2A.

"The Louisiana Insurance Code provides the methods by which and the conditions under which an insurance policy may be terminated by cancellation or nonrenewal.... The only limitation on the renewal or nonrenewal of insurance policies is contained in La.R.S. 22:636.1, applicable only to automobile liability insurance policies,

which provides that an insurer may not fail to renew an automobile policy unless it gives the required notice of its intent not to renew.... Other than these restrictions, specifically applicable only to automobile liability insurance policies, there are no statutory restrictions on the insurer's exercise of its statutory right not to renew a policy." *Gautreau v. Southern Farm Bureau Casualty Ins. Co.*, 429 So.2d 866, 868 (La.1983).

The only definition of renewal in the Louisiana Insurance code defines renewal of a policy as "the issuance and delivery by an insurer of a policy replacing it at the end of the policy period a policy previously issued and delivered by the same insurer...." La.Rev.Stat. 22:636.1(A)(5). This provision, however, applies only to automobile liability insurance policies. In construing this provision, courts have held that policies with different limits of liability and even policies insuring a different automobile with differing coverage may in fact be renewals. *See Moore v. Young*, 490 So.2d 519 (La.App. 4th Cir.1986), and *Myers v. Thibeaux*, 365 So.2d 266 (La.App. 3d Cir. 1978).

Louisiana case law, in referring to insurance law in general, has held that the word "renewal" has a definite legal meaning:

"Renewal" means that the original policy shall be repeated in substance and in fact; to express the legal meaning briefly, a "renewal" would simply mean that the policy in force was to be extended as to the time it was to remain in force. In other words, that the new policy would be identical, except to the date of its expiration.

*See Maryland Casualty Co. v. Kramel*, 80 So.2d 897, 900 (La.App. 2d Cir.1955), *citing Ouachita Parish Police Jury v. Northern Insurance Co. of New York*, 176 So. 639, 640 (La.App. 2d Cir.1937). Reformation of "non-renewal" policies has been allowed when the parties had intended the renewal to be identical or the insurer engaged in deceptive renewal practices. *See*, respec-

tively, *Maryland Casualty Co. v. Kramel*, 80 So.2d 897 (La.App. 2d Cir.1955) and *Gautreau v. Southern Farm Bureau Casualty Ins. Co.*, 429 So.2d 866 (La.1983).

Notwithstanding the jury's responses to Interrogatories No. 25, 26 and 27, this court does not find that International engaged in misleading renewal tactics or that the parties intended the 1984 policy to be identical to the 1983 policy. The 1984 policy was clearly different from the 1983 policy, as the policy limits were reduced $5 million and the policy term limited to one year.

After reviewing the record, this court concludes that reformation of the 1984 policy is not warranted; furthermore, the Discovery Clause of the 1983 policy may not be invoked, as the time limits for invoking this clause were not tolled by any notice requirement and, thus, have expired. Equity would not justify a different result.

In International's Reply Memorandum, International asserts that the FDIC and Insureds fail to acknowledge that defense costs reduce the available limit of the policy. The issue of insurance coverage has now been placed squarely before the court; International has not provided the court with amounts or even estimates of defense costs which they allege are deductible from the policy limits, in spite of the extensive filings submitted to the court. On the issue of insurance coverage, International's lack of briefing leaves this court with no alternative but to consider this argument waived.

Coverage exists pursuant to the 1983 policy in the amount of $17,504,946 for the grossly negligent acts which the jury found to have occurred during the years 1981 through 1983. Coverage does not exist under the 1984 policy, due to the classified loan exclusion. Plaintiff is hereby ORDERED to submit a judgment consistent with the terms of this Memorandum Ruling within ten (10) days of receiving this ruling.

## APPENDIX A
### JURY INTERROGATORIES

**QUESTION NO. 1:**
WITH REGARD TO THE LOAN TO AMI, INC., ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____Yes____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 2. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $   1,793,226

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?

YES ✓     NO____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $   1,793,226

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $     0

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $     0

2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER JAN 1ST 1985?
ANSWER: $     0

**QUESTION NO. 2:**

WITH REGARD TO THE LOAN TO ARTEX FINANCE CORPORATION, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____Yes____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 3. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.   IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $    259,328

D.   IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
                    YES ✓    NO ____

E.   IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $        0

F.   IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $    259,328

G.   IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
     1.   WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
          ANSWER: $      0

     2.   WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
          ANSWER: $      0

**QUESTION NO. 3:**
  WITH REGARD TO THE LOAN TO CARNEY, INC., ANSWER THE FOLLOWING QUESTIONS:
A.   DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER:      Yes

B.   IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 4.  IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.   IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $    814,405

D.   IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
                    YES ✓    NO ____

E.   IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $    591,040

F.   IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $ __223,365__

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
    ANSWER: $_____0_____
2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
    ANSWER: $_____0_____

**QUESTION NO. 4:**
WITH REGARD TO THE LOAN TO CUMMINGS INDUSTRIES, INC., ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: _____Yes_____

B.  IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 5. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.  IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $ __1,333,788__

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓   NO ____

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $ __1,333,788__

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $_____0_____

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
    ANSWER: $_____0_____
2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
    ANSWER: $_____0_____

**QUESTION NO. 5:**
WITH REGARD TO THE DAVID DISIERE AND/OR DISIERE/GAY PROPERTIES, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY

TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____Yes____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 6. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| ✓ GUS MIJALIS | ✓ HARPER COX |
| ✓ ALEX MIJALIS | ✓ JOHN FRANKLIN |
| ✓ JOHN COSSE | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $  1,841,254

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?

YES ✓  NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $  1,841,254

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $    0

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $    0

2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $    0

**QUESTION NO. 6:**

WITH REGARD TO THE LOAN TO GAY/ELLERBE ROAD, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____Yes____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 7. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| ✓ GUS MIJALIS | ✓ HARPER COX |
| ✓ ALEX MIJALIS | ✓ JOHN FRANKLIN |
| ✓ JOHN COSSE | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $  3,504,431

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?

YES ✓ NO ____

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $ 0

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $ 3,504,431

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $ 0

2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $ 0

**QUESTION NO. 7:**

WITH REGARD TO THE LOAN TO SUCCESSION OF WILEY D. FOWLER, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: Yes

B.  IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 8. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| ✓ | GUS MIJALIS | ✓ | HARPER COX |
|---|---|---|---|
| ✓ | ALEX MIJALIS | | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.  IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $ 307,637

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?

YES ✓ NO ____

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $ 307,637

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $ 0

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
   1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
       ANSWER: $_____0_____
   2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
       ANSWER: $_____0_____

**QUESTION NO. 8:**

WITH REGARD TO THE LOAN TO GEORGE GALLIE, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: _____Yes_____

B.  IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 9. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| ✓ | GUS MIJALIS | _____ | HARPER COX |
| ✓ | ALEX MIJALIS | _____ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.  IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $  2,180,931

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
                     YES ✓   NO _____

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $  2,180,931

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $     0

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
   1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
       ANSWER: $_____0_____
   2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
       ANSWER: $_____0_____

**QUESTION NO. 9:**

WITH REGARD TO THE LOAN TO 554 KINGS HIGHWAY, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____Yes___

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 10. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $___737,952___

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES _✓__ NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $_____0_____

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $___737,952___

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $_____0_____
2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $_____0_____

**QUESTION NO. 10:**
WITH REGARD TO THE LOAN TO MEC, ANSWER THE FOLLOWING QUESTIONS:
A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: _____Yes___

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 11. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $___1,588,295___

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES _✓__ NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981– 1983?

ANSWER: $   0

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $  1,588,295

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
   1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
   ANSWER: $   0

   2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
   ANSWER: $   0

**QUESTION NO. 11:**

WITH REGARD TO THE LOAN TO R.A. OXENREITER, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER:   Yes

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 12. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | |
|---|---|---|
| ✓ GUS MIJALIS | | ✓ HARPER COX |
| ✓ ALEX MIJALIS | |     JOHN FRANKLIN |
| ✓ JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $  522,398

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
   YES ✓   NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981– 1983?

ANSWER: $  485,104

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $  37,294

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
   1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
   ANSWER: $   0

2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $_____0_____

## QUESTION NO. 12:

WITH REGARD TO THE LOAN TO POUNDERS-CLOYD, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: _____YES_____

B.  IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 13. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| ✓ | GUS MIJALIS | ✓ | HARPER COX |
|---|---|---|---|
| ✓ | ALEX MIJALIS | | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C.  IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $__2,883,695__

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓___ NO ___

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $__836,147__

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $__2,047,548__

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $_____0_____

2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $_____0_____

## QUESTION NO. 13:

WITH REGARD TO THE LOAN TO PRITCHARD ENGINEERING, ANSWER THE FOLLOWING QUESTIONS:

A.  DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: _____YES_____

B.  IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 14. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $ 2,790,437

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓ NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $ 2,790,437

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $ 0

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $ 0

2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $ 0

**QUESTION NO. 14:**
WITH REGARD TO THE LOAN TO RETAMCO, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?
ANSWER: YES

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 15. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.
ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $ 1,677,572

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓ NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $ 1,677,572

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $    0

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $    0

2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $    0

**QUESTION NO. 15:**

WITH REGARD TO THE LOAN TO RICOU BREWSTER, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER:    YES

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 16. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | | |
|---|---|---|---|
| ✓ | GUS MIJALIS | ✓ | HARPER COX |
| ✓ | ALEX MIJALIS | ✓ | JOHN FRANKLIN |
| ✓ | JOHN COSSE | | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $   4,065,004

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓    NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $   1,748,437

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $   2,316,567

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $    0

2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $    0

**QUESTION NO. 16:**

WITH REGARD TO THE LOAN TO SECTRA CORPORATION, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____YES____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 17. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | |
|---|---|---|
| ✓_____ GUS MIJALIS | ✓_____ HARPER COX |
| ✓_____ ALEX MIJALIS | ✓_____ JOHN FRANKLIN |
| ✓_____ JOHN COSSE | |

C. IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?

ANSWER: $___1,901,311__

D. IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?

YES ✓__   NO ____

E. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?

ANSWER: $___1,901,311__

F. IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?

ANSWER: $_____0____

G. IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:

   1. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
      ANSWER: $_____0_____

   2. WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
      ANSWER: $_____0_____

**QUESTION NO. 17:**

WITH REGARD TO THE LOAN TO JOHN F. WOLCOTT, ANSWER THE FOLLOWING QUESTIONS:

A. DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE DEFENDANT DIRECTORS AND/OR OFFICERS FAILED PROPERLY TO DISCHARGE THEIR DUTIES AND WERE GROSSLY NEGLIGENT IN CONNECTION WITH THIS LOAN?

ANSWER: _____YES____

B. IF YOUR ANSWER TO SUBPART "A" IS "NO," GO TO QUESTION NO. 18. IF YOUR ANSWER TO SUBPART "A" IS "YES," IDENTIFY BY A CHECK MARK WHICH DEFENDANT, IF ANY, WAS GROSSLY NEGLIGENT.

ANSWER:

| | | |
|---|---|---|
| ✓_____ GUS MIJALIS | ✓_____ HARPER COX |
| ✓_____ ALEX MIJALIS | ✓_____ JOHN FRANKLIN |
| ✓_____ JOHN COSSE | |

C.  IF YOUR ANSWER TO SUBPART "A" IS "YES," WHAT IS THE AMOUNT OF LOSS CAUSED AS A RESULT OF SUCH GROSS NEGLIGENCE?
ANSWER: $   259,230

D.  IF YOUR ANSWER TO SUBPART "B" IS "YES," DO YOU FIND THAT SOME OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRED DURING THE YEARS 1981–1984?
YES ✓   NO ____

E.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS BY THE DEFENDANTS OCCURRING DURING THE YEARS 1981–1983?
ANSWER: $   18,062

F.  IF YOUR ANSWER TO SUBPART "D" IS "YES," WHAT TOTAL AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRING DURING 1984?
ANSWER: $   241,168

G.  IF YOUR ANSWER TO SUBPART "B" IS "YES," BUT YOU DO NOT FIND THAT ALL OF THE GROSSLY NEGLIGENT ACTS OR OMISSIONS OCCURRED DURING THE YEARS 1981–1984:
1.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING PRIOR TO 1981?
ANSWER: $   0

2.  WHAT AMOUNT OF DAMAGES, IF ANY, DO YOU ATTRIBUTE TO ACTS OR OMISSIONS OCCURRING AFTER 1985?
ANSWER: $   0

H.  IF YOU ANSWERED "YES" TO ANY OF THE ABOVE QUESTIONS, PLEASE ANSWER QUESTIONS 18 THROUGH 28.  IF YOU HAVE NOT ANSWERED "YES" TO ANY OF THE ABOVE QUESTIONS, PLEASE SIGN THE VERDICT FORM AND RETURN TO THE COURTROOM.

**QUESTION NO. 18:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE FOLLOWING PERSONS INTENTIONALLY VIOLATED ANY REGULATIONS OF THE FDIC IN APPROVING OR FUNDING ANY OF THE LIABILITY LOANS?

| | | YES | NO |
|---|---|---|---|
| A. | GUS MIJALIS | | ✓ |
| B. | ALEX MIJALIS | | ✓ |
| C. | JOHN COSSE | | ✓ |
| D. | JOHN FRANKLIN | | ✓ |
| E. | HARPER COX | | ✓ |

**QUESTION NO. 19:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT ANY OF THE FOLLOWING PERSONS INTENTIONALLY VIOLATED THE TERMS OF THE CEASE AND DESIST ORDER?

| | | YES | NO |
|---|---|---|---|
| A. | GUS MIJALIS | | ✓ |
| B. | ALEX MIJALIS | | ✓ |
| C. | JOHN COSSE | | ✓ |
| D. | JOHN FRANKLIN | | ✓ |
| E. | HARPER COX | | ✓ |

**QUESTION NO. 20:**

DID BOTH PARTIES TO THE INSURANCE CONTRACT INTEND FOR THE 1984 INSURANCE POLICY'S REGULATORY EXCLUSION PROVISION TO EXCLUDE CLAIMS BY THE FDIC?
YES ____   NO ✓

**QUESTION NO. 21:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE CONTENTS OF THE LETTER DATED SEPTEMBER 22, 1982, FROM HARPER COX TO INTERNATIONAL, MISREPRESENTED WITH THE INTENT TO DECEIVE THE CONDITION OF THE BANK OF COMMERCE IN CONNECTION WITH THE PROPOSAL FORM FOR AN INCREASE IN INSURANCE COVERAGE?

YES _____ NO ✓___

IF YOU ANSWERED "YES" TO QUESTION NO. 21, ANSWER QUESTION NO. 22. IF YOU ANSWERED "NO," PLEASE PROCEED TO QUESTION NO. 23.

**QUESTION NO. 22:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT INTERNATIONAL REASONABLY RELIED ON SUCH MATERIAL FALSE REPRESENTATIONS OR OMISSIONS, IF ANY, IN INCREASING THE LIMITS OF LIABILITY?

YES _____ NO _____

**QUESTION NO. 23:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE DIRECTORS AND OFFICERS MADE MATERIAL FALSE MISREPRESENTATIONS OR OMISSIONS WITH THE INTENT TO DECEIVE IN CONNECTION WITH THE FINANCIAL STATEMENTS SUBMITTED TO INTERNATIONAL INSURANCE COMPANY REGARDING THE 1982 AMENDMENT REMOVING THE CLASSIFIED LOAN EXCLUSION?

YES _____ NO ✓___

IF YOU ANSWERED "YES" TO QUESTION NO. 23, ANSWER QUESTION NO. 24. IF YOU ANSWERED "NO," PLEASE PROCEED TO QUESTION NO. 25.

**QUESTION NO. 24:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT INTERNATIONAL REASONABLY RELIED ON SUCH MATERIAL FALSE MISREPRESENTATIONS OR OMISSIONS, IF ANY, IN ISSUING THE POLICY?

YES _____ NO _____

**QUESTION NO. 25:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE DULY AUTHORIZED OFFICER OF THE BANK OF COMMERCE HAD KNOWLEDGE THAT THE 1984 POLICY CONTAINED THE REGULATORY EXCLUSION PRIOR TO THE TIME THE POLICY WENT INTO EFFECT?

YES _____ NO ✓___

**QUESTION NO. 26:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE DULY AUTHORIZED OFFICER OF THE BANK OF COMMERCE HAD KNOWLEDGE THAT THE 1984 POLICY CONTAINED THE INSURED V. INSURED EXCLUSION PRIOR TO THE TIME THE POLICY WENT INTO EFFECT?

YES _____ NO ✓___

**QUESTION NO. 27:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE DULY AUTHORIZED OFFICER OF THE BANK OF COMMERCE HAD KNOWLEDGE THAT THE 1984 POLICY CONTAINED THE CLASSIFIED LOAN EXCLUSION PRIOR TO THE TIME THE POLICY WENT INTO EFFECT?

YES _____ NO ✓___

**QUESTION NO. 28:**

DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE 1983 CEASE AND DESIST ORDER WAS COMPLIED WITH BY THE DIRECTORS AND OFFICERS OF THE BANK OF COMMERCE?

YES _____ NO ✓___

DATED: DECEMBER 12, 1991

_____
                                          FOREMAN
_____
_____
_____
_____
_____