[No. 22544-8-I.   Division One.   June 5, 1989.]

SAFECO TITLE INSURANCE COMPANY, *Plaintiff,* v. RAYMOND C. GANNON, *Appellant,* FEDERAL INSURANCE COMPANY, *Respondent.*

*Don M. Gulliford* and *Nicholas L. Clapham,* for appellant.

*William J. Price, Robert Gostin Mitchell, Philip A. Talmadge,* and *Karr, Tuttle, Campbell,* for respondent.

COLEMAN, C.J.—Raymond Gannon appeals from the dismissal on summary judgment of his cause in which he sought declaratory relief concerning Federal Insurance Company's duty to defend him in a related action. We affirm.

On January 17, 1983, Gannon, as an employee of First Washington Mortgage & Escrow, Inc., processed a deed of trust through escrow for Michael Lafferty and a woman purporting to be his wife Nancy Lafferty. Gannon notarized their signatures.

On January 28, 1983, Mr. Shaw, a Safeco Title insurance agent in Mason County, Washington, where the property at issue was located, informed Gannon that the woman purporting to be Nancy Lafferty was not who she said she was

and that her signature on the deed of trust was a forgery. Shaw advised Gannon to "see his attorney."

The real Nancy Lafferty, Nancy A. Herzog, Michael Lafferty's former wife, filed an action in Mason County Superior Court to quiet title on the property subject to the forged deed and to invalidate any indebtedness she incurred under that deed. Safeco settled Herzog's claims against the title policy for $15,331.15. Neither Gannon nor First Washington were parties to that action, but First Washington did provide certain documents to Safeco pursuant to a subpoena duces tecum.

First Washington ceased doing business in the spring of 1983 and was dissolved by the Secretary of State's office in July 1983. Safeco proceeded with a subrogation claim against Gannon in 1984 for negligently notarizing the signature of Nancy Lafferty, filing suit in May 1985. The lawsuit was the first contact Gannon had with anyone from Safeco since May 1983. First Washington was insured under an escrow agent's liability policy with Federal Insurance Company against "claims first brought against the Insured during the Claims Period, regardless of when the Breach of Escrow Duty (as defined in the policy) may have occurred." The policy initially provided coverage from May 20, 1979, to May 20, 1980, and thereafter was renewed annually through May 20, 1983, at which time the policy terminated.

On June 21, 1985, Gannon tendered his defense to Federal, but Federal denied the tender on the basis that its "claims–made" policy expired in 1983 and that this claim was first made in the fall of 1984 when Safeco began proceeding with its subrogation suit. Gannon admits that he did not know he was going to be sued until the fall of 1984, well after the expiration of his insurance coverage and for that reason he was unable to notify Federal of a claim within the policy period.

Gannon filed a third party complaint in the underlying action seeking declaratory relief on Federal's duty to defend him. Federal and Gannon brought cross motions for

summary judgment. Federal's motion was granted and Gannon's action was dismissed.

The insurance policy at issue was effective from May 20, 1982, to May 20, 1983. The policy insured First Washington for escrow agents' liability and was a "claims–made" policy:

> This is a claims made policy, except to the extent as may otherwise be provided herein. This policy covers claims first brought against the insured during the Claims Period, regardless of when the Breach of Escrow Duty (as defined in the policy) may have occurred.

Federal agreed to

> pay on behalf of the insured all claims which the Insured shall become legally obligated to pay as damages on account of any claims first made against the Insured during the Policy Period as a result of any actual or alleged Breach of Escrow Duty committed by an officer, partner or employee of the Insured or by any other person for whom the Insured is legally responsible.

The policy does not define "claim."

The first information appellant provided to respondent regarding Safeco's claim was his letter of June 1985 tendering his defense to Federal, 2 years after the expiration of the policy period. Nonetheless, appellant argues that Safeco's claim against him was first made within the policy period because information received by the insured during the policy period and ultimately leading to a claim by a third party is sufficient to constitute a claim for purposes of a claims–made policy.

Thus, we must construe the meaning of the word "claim." In so doing, we must determine whether claim, as used in this policy, is an undefined term which should be given its plain, ordinary meaning, *Prudential Property & Cas. Ins. Co. v. Lawrence,* 45 Wn. App. 111, 118, 724 P.2d 418 (1986), or instead is an ambiguous term to be construed against the insurer. *Haney v. State Farm Ins. Co.,* 52 Wn. App. 395, 397, 760 P.2d 950 (1988).

Appellant cites two authorities for the proposition that "claim" is ambiguous. In the first, *Barto v. Stewart,* 21 Wash. 605, 615, 59 P. 480 (1899), the court stated that

"claim" is an especially broad term. *Barto,* at 614. Being widely encompassing is not, however, synonymous with being ambiguous.

Appellant also cites *J.G. Link & Co. v. Continental Cas. Co.,* 470 F.2d 1133 (9th Cir. 1972), interpreting Montana law for the proposition that "claim" is ambiguous. *Link* involved a policy that provided coverage for negligent acts occurring during the policy period, but only if claims arising from those acts were also reported during that period. Thus, the issue in *Link* was the ambiguity of whether the policy provided occurrence or claims–made coverage and how to interpret "claim" in light of that ambiguity. *Link,* at 1137. The instant policy, being a straightforward claims–made policy, contains no such ambiguity.

█ Moreover, in the instant case, the policy itself distinguishes between "claims" and "facts and circumstances which may give rise subsequently to a claim hereunder." Under the claims after termination clause, if notice of "facts and circumstances" that may later give rise to a claim is sent to the insurer prior to expiration of the claims period, that later arising claim will "be deemed to have been first made during the policy period." Because contracts are interpreted as a whole, *Hunt v. Occidental Life Ins. Co.,* 68 Wn.2d 394, 397, 413 P.2d 349 (1966), the clear intent of this policy is to distinguish between "claims" and "facts and circumstances leading to claims." As the two are used in this policy, they cannot mean the same thing. Accordingly, the ambiguity appellant would have us find in this policy does not exist.

█ We must construe the undefined term "claim" as it is used in this policy. "Claim" ordinarily means a demand on the insured for damages resulting from the insured's alleged negligent act or omission. *See, e.g., Bensalem Township v. Western World Ins. Co.,* 609 F. Supp. 1343, 1348 (E.D. Pa. 1985); *Phoenix Ins. Co. v. Sukut Constr. Co.,* 136 Cal. App. 3d 673, 186 Cal. Rptr. 513, 515 (1982); *Burlington Cy. Abstract Co. v. QMA Assocs., Inc.,* 167 N.J. Super. 398, 400 A.2d 1211, 1214 (1979) ("claim" should not

be confused with the cause giving rise to the claim because a single cause can give rise to many claims). We conclude that the plain, ordinary meaning of claim is a demand for compensation.

Appellant offers the following facts in support of his argument that a claim was made during the policy period: On January 20, 1983, 3 days after the escrow closed, an Illinois attorney notified appellant of the forgery. This led appellant to notify the president of First Washington. On approximately January 28, appellant was notified by an agent of Safeco in Mason County, where the property was located, that there was a forgery and that appellant should "see his attorney." First Washington was required to provide documents in the underlying dispute pursuant to a subpoena duces tecum. Appellant says these facts constituted notice of Safeco's "imminent subrogation claim."

These facts, however, do not constitute a demand for compensation. Instead, they are facts and circumstances that later gave rise to Safeco's claim. Accordingly, no claim was made by Safeco against appellant within the policy period and appellant was thus not entitled to receive coverage under the claims–made clause.

We next address appellant's argument that he was wrongfully denied coverage under the policy's claims after termination clause, which provides:

> If during the Policy Period . . . the Insured shall become aware of any fact or circumstance which may give rise subsequently to a claim hereunder and gives written notice to the Company during such period, then any subsequent claim made against the Insured arising out of such fact or circumstance shall, for the purposes of this policy, be deemed to have been first made during the Policy Period.

While the record establishes that appellant was in possession of facts and circumstances during the policy period that subsequently gave rise to the claim made against him, it also establishes that appellant did not give notice to the insurer of those facts within the policy period. In fact, the

first notice respondent received of the claim was in June 1985 when appellant tendered his defense, more than 2 years after the expiration of the policy. Accordingly, appellant is not entitled to coverage under this clause. Appellant argues, however, that the notice/prejudice rule prevents respondent from denying coverage.

The notice/prejudice rule requires carriers, in order to exclude coverage because of an insured's failure to comply with a policy's notice requirement, to show actual prejudice resulting from the lack of notice. *Oregon Auto Ins. Co. v. Salzberg*, 85 Wn.2d 372, 377, 535 P.2d 816 (1975). When an insured violates a "cooperation clause," *i.e.*, a clause requiring the insured to assist in every way in the investigation and defense of the claim, the insurer must show actual prejudice resulting from the breach of the clause in order to deny coverage on that basis. The rule applies to the notice provisions usually found in cooperation clauses, which exclude coverage if the insured fails to notify the insurer of accidents or occurrences in a timely manner. *See, e.g., Felice v. St. Paul Fire & Marine Ins. Co.*, 42 Wn. App. 352, 358, 711 P.2d 1066 (1985), *review denied*, 105 Wn.2d 1014 (1986); *Thompson v. Grange Ins. Ass'n*, 34 Wn. App. 151, 163, 660 P.2d 307, *review denied*, 99 Wn.2d 1011 (1983).

While there are sound reasons for applying the notice/prejudice rule to the typical notice provision in an occurrence policy, those reasons do not apply with equal force to the notice provision in the claims after termination clause at issue here. The notice/prejudice rule developed in an attempt to avoid the perceived unfairness of denying coverage for failure to comply with a notice provision if the insurer was not prejudiced by that failure. R. Keeton & A. Widiss, *Insurance Law* § 7.2(e)(2), at 764 (1988). Because notice provisions exist to prevent insurers from being prejudiced by their insureds' dilatory filing of claims, to allow the denial of coverage where untimely notice of a claim does not prejudice the insurer would be to elevate form over substance. R. Keeton & A. Widiss, at 763–64. Thus,

the notice/prejudice rule was created fundamentally to preserve the insured's coverage in those cases where the lack of notice does not prejudice the insurer. *See Oregon Auto,* at 376–77; *Thompson,* at 163.

As an absolute prerequisite to claims after termination coverage (just as an occurrence policy requires an "occurrence" or a claims–made policy requires a "claim"), the claims after termination clause requires (1) the insured's knowledge of facts and circumstances that might later become a claim; (2) written notice of those facts to the insurer; and (3) the notice must be provided within the policy period. The notice is critical to the insurer in the type of coverage provided here because the policy is structured to allow the insurer to assess its risk. Unlike occurrence policies, where the insurer contracts to cover risk that is by its very nature open–ended, claims–made policies attempt to define the risk so that it is ascertainable at the end of the policy period.

> "Claims made" or "discovery" policies beneficially permit insurers to more accurately predict the limits of their exposure and the premium needed to accommodate the risk undertaken, with countervailing benefits to insureds in premiums lower than would be necessary for "occurrence" policies.

7A J. Appleman, *Insurance* § 4504.01 (Supp. 1988). We find the comments of the court in *Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 So. 2d 512, 515–16, 37 A.L.R.4th 374 (Fla. 1983), instructive in this regard:

> Notice within an occurrence policy is not the critical and distinguishing feature of that policy type. Occurrence policies are built around an insurer who is liable for the insured's malpractice, no matter when discovered, so long as the malpractice occurred within the time confines of the policy period. Coverage depends on when the negligent act or omission occurred and not when the claim was asserted. The occurrence insurer, then, is faced with a "tail" that extends beyond the policy period itself. This "tail" is the lapse of time between the date of the error (within the policy period) and the time when a claim is made against the insured. The giving of notice is only a

condition of the policy, and in no manner is it an extension of coverage itself. It does not matter when the insurer is notified of the claim by the insured, so long as the notification is within a reasonable time and so long as the negligent act or omission occurred within the policy period itself.

Claims–made policies, likewise, require that notification to the insurer be within a reasonable time. Critically, however, claims–made policies require that that notice be given *during the policy period* itself. When an insured becomes aware of any event that could result in liability, then it must give notice to the insurer, and that notice must be given "within a reasonable time" or "as soon as practicable"—at all times, however, during the policy period.

With claims–made policies, the very act of giving an extension of reporting time after the expiration of the policy period, . . . [would negate] the inherent difference between the two contract types. Coverage depends on the claim being made and reported to the insurer during the policy period. Claims–made or discovery policies are essentially *reporting* policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches. If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties. This we cannot and will not do.

As one commentator has noted:

An underwriter who is secure in the fact that claims will not arise under the subject policy . . . after its termination or expiration can underwrite a risk and compute premiums with greater certainty. The insurer can establish his reserves without having to consider the possibilities of inflation beyond the policy period, upward–spiralling jury awards, or later changes in the definition and application of negligence.

Kroll, [*The "Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L. Rev. 925,] 928, [(1975)] (footnote omitted). This theoretically results in

lower premiums for an insured since there is no open–ended "tail" after the expiration date of the policy.

(Footnote omitted.) *Gulf,* 433 So. 2d at 515–16.

Thus, while it makes sense from a public policy standpoint to apply the notice/prejudice rule to notice provisions in occurrence policies because to do so merely preserves existing coverage and, absent a showing of prejudice, does not materially alter the insurer's risk, the same cannot be said for applying the rule to claims after termination clauses. Application of the notice/prejudice rule in the latter situations would materially alter the insurer's risk by making it difficult to ascertain potential liability with certainty at the end of the policy period. *See* 7A J. Appleman § 4504.01. Moreover, unlike an occurrence policy's cooperation clause, which has the effect of excluding already existing coverage, the claims after termination clause at issue here is not an exclusion—it provides additional coverage the insured would not otherwise have. Consequently, application of the notice/prejudice rule would not function to preserve existing coverage; instead it would actually expand coverage to include subsequent claims based on facts either unreported during the policy period or unrecognized as potential claims by the insured—coverage not contracted for or provided. *Gulf,* 433 So. 2d at 515–16.

To apply the notice/prejudice rule to claims after termination clauses would also have the deleterious effect of discouraging insurers from offering this type of additional coverage. In contrast, the application of the notice/prejudice rule to cooperation clauses has the public policy effect of preserving, not curtailing, coverage.

We find that the notice/prejudice rule does not apply to the claims after termination clause because to do so would be to provide coverage the insurer did not intend to provide and the insured did not contract to receive. *See Greer v. Northwestern Nat'l Ins. Co.,* 109 Wn.2d 191, 197, 743 P.2d 1244 (1987); *Aetna Ins. Co. v. Kent,* 85 Wn.2d 942, 946, 540 P.2d 1383 (1975).

Accordingly, we find that appellant's failure to provide respondent with notice within the policy period of facts and circumstances that might lead to a claim precludes appellant from receiving coverage under the after termination clause.

Finally, we address whether claims–made policies frustrate public policy or violate statutes or regulations requiring escrow agents to have errors and omissions coverage.

Appellant argues that coverage provided by the Federal policy in this case is inadequate under the Escrow Agent Registration Act. Escrow agents and employees engaged in escrow transactions must maintain an errors and omissions insurance policy providing aggregate coverage of at least $50,000. RCW 18.44.050. For the purposes of RCW 18.44-.050

> an "errors and omissions policy" shall mean a group or individual insurance policy satisfactory to the director and issued by an insurer authorized to transact insurance business in the state of Washington. Such policy shall provide coverage for unintentional errors and omissions of the escrow agent and its employees, and may be canceled by the insurer upon delivery of thirty days' written notice to the director and to the escrow agent.

*See also* WAC 308–128F–020.

Appellant argues that the Federal policy and claims–made policies in general do not provide the mandated coverage because, even though the policy was in effect at the time of appellant's alleged error or omission, the policy does not provide coverage for Safeco's claim based on that alleged error. Appellant's argument is without merit. Claims–made policies in general do not violate public policy. *See, e.g., Breaux v. St. Paul Fire & Marine Ins. Co.,* 326 So. 2d 891 (La. Ct. App. 1976); *Rotwein v. General Accident Group,* 103 N.J. Super. 406, 247 A.2d 370, 376 (1968). RCW 18.44.050 requires escrow agents to carry professional liability coverage for errors and omissions. RCW 18.44.050. The act does not purport to require insurers to offer such coverage. In fact, it permits the director to waive

the errors and omissions requirement if it appears such a "policy is not reasonably available". RCW 18.44.360. Thus, it is clear that the thrust of the act is not to mandate that insurers provide a particular kind of coverage; instead, the apparent purpose of the provision is to require agents to carry some type of professional liability coverage.

The reason appellant did not have coverage under this policy is not because the coverage of the policy itself was inadequate under RCW 18.44.050. Rather, appellant did not have coverage because (1) no claim was made during the policy period; (2) neither appellant nor First Washington notified respondent during the policy period of the known facts and circumstances here that might lead to a claim, thus preserving coverage under the claims after termination clause; and (3) neither appellant nor First Washington chose to purchase "Discovery Period Extension" coverage available from this insurer and explained in appellant's policy to cover additional claims made after the termination based on acts occurring within the original policy period.[1] The policy here potentially provided full coverage for appellant under the facts of this case. The fact that coverage was not provided was a result of appellant's failure to notify respondent of the facts and circumstances that might lead to a claim. Accordingly, there is no basis for concluding that this policy provided statutorily inadequate coverage.

The judgment of the trial court is affirmed.

WEBSTER and WINSOR, JJ., concur.

Reconsideration denied July 26, 1989.

Review denied at 113 Wn.2d 1026 (1989).

---

[1]We note that generally when an insured's claims–made policy is terminated or lapses, the insured purchases additional "tail" coverage against future claims arising from occurrences within the claims–made period. R. Keeton & A. Widiss, *Insurance Law* § 5.10(d)(3), at 598 (1988).