IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BRAD and AMY WHALEY, and BRAD and AMY WHALEY dba CAFÉ BURLINGTON,<br><br>        Appellants,<br><br>        v.<br><br>OHIO SECURITY INSURANCE COMPANY,<br><br>        Respondent,<br><br>and<br><br>ALPINE FIRE & SAFETY SYSTEMS, INC., STEPHEN BOUNDS, CAFÉ BURLINGTON, LLC, ALLIE and MANNY MARTINEZ, a married couple, and MARTHA VARGAS,<br><br>        Defendants. | No. 86200-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Brad and Amy Whaley (collectively, the "Whaleys") own a building in Burlington, Washington, and rented it out as the Café Burlington. In December 2019, a fire in the Café caused fire and smoke damage. The Whaleys filed a claim with their insurance provider, Ohio Security Insurance Company (Ohio Security). Ohio Security denied the claim, citing exclusions that required the Whaleys to comply with certain protective safeguards for their fire suppression systems. The Whaleys filed a lawsuit against Ohio Security for

breach of contract and bad faith. Ohio Security filed a motion for summary

judgment, which the trial court granted and the Whaleys now appeal. We affirm.

FACTS

Brad and Amy Whaley owned a restaurant, the Café Burlington, in

Burlington, Washington. The Whaleys rented the Café to the Martinez and

Vargas families. The Whaleys retained a commercial property insurance policy

for the building through Ohio Security, an affiliate of Liberty Mutual Insurance.

The Whaleys' policy covered property damage, defined as "[p]hysical

injury to tangible property, including all resulting loss of use of that property." The

policy included a Protective Safeguards endorsement that modified the

Commercial Property Conditions as follows:

**Protective Safeguards**

1.  As a condition of this insurance, you are required to maintain
    the protective devices or services listed in the Schedule above.

2.  The protective safeguards to which this endorsement applies
    are identified by the following symbols:
. . . .

"P-9", the protective system described in the Schedule. . . .
[Including] [a]n automatic commercial kitchen fire suppression
including hoods, plenums, exhaust ducts, and fire extinguishing
equipment, over cooking appliances that is in compliance with both
Underwriters Laboratories standard 300 (UL 300) and National Fire
Protective Association 96 (NFPA 96).[1] The suppression system
must be inspected and serviced semi-annually by an independent
contractor and the ventilating system must be cleaned quarterly by
an independent contractor.

---

[1] According to the National Fire Protective Association website, the NFPA 96 standard "provides preventive and operative fire safety requirements intended to reduce the potential fire hazard of both public and private commercial cooking operations." See https://www.nfpa.org/codes-and-standards/nfpa-96-standard-development/96 (last visited May 20, 2025).

The Protective Safeguards endorsement also added the following language in the Exclusions section:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> 1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
> 2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

The Kidde Wet Chemical Fire Suppression System in the Café's kitchen involves a wet chemical agent that can be activated either manually or automatically. Automatic activation occurs through release of cable tension that is connected to detection devices called fusible links. When a specified temperature rating is exceeded, the link activates the system. A properly installed and functioning commercial kitchen ventilation system keeps fire and smoke within the hood and keeps it from spreading. The hood extends over the cooking appliances, and the area inside the hood called the plenum houses the fusible links that trigger activation of the fire suppression system. The exhaust duct and the hood/plenum interface must be welded together to form a "liquid tight" seal to prevent accumulation of grease, a fuel, outside the exhaust duct and hood/plenum and to keep smoke and heat or fire from escaping the fire suppression system during a fire.

On September 18, 2019, Alpine Fire and Safety Systems, Inc. (Alpine Fire), a fire safety inspection company, conducted a service test at the Café. The inspector, Dave Kilmer, rated the system as a "yellow tag," which means that the

system is operational but is noncompliant. In conducting his inspection, Kilmer conducted system operation tests and the system was "fully operational." However, Kilmer found that there were multiple deficiencies in the fire suppression system, including lack of link detection for the four-burner, "make up air did not shut down upon system actuation, exhaust fan didn't come on during system actuation,"[2] "improper nozzle coverage over griddle," and "exhaust duct not properly sealed using silicone." Other deficiencies included that cinder blocks were improperly being used to support appliances, and there was "heavy fuel build up" both in the cinder block openings and behind the appliances. The report noted that "system is not designed to extinguish heavy fuel build up." Kilmer marked "no" for several questions, including "Are all heated appliance surfaces protected?", "Positioning of all nozzles is appropriate?", "Is system UL 300 compliant?" and "Does system have adequate volume and/or nozzle coverage?" The report also marked the fire suppression systems as "fail" in multiple aspects, including "[s]ystem meets or exceeds MFG requirements," "[s]ystem meets UL 300 requirements," and "[s]ystem design and approval OK."

On September 30, 2019, the city of Burlington (the City) conducted an annual fire safety inspection of the Café. It informed the Café it had found "concerns" with the system that needed to be addressed within 30 days. Specifically, the commercial range hood did not have a "liquid-tight weld" and

---

[2] When the kitchen is operating, an exhaust fan on top of the duct creates negative pressure to remove the cooking exhaust through the duct. Because the exhaust fan creates negative pressure, exhausted air is replaced with "make-up air." If the fire suppression system activates, the exhaust fan should automatically turn on and the make-up air should deactivate, so that while fire is drawn into the system, fresh air is not introduced to fuel the fire.

there was accumulated grease. Further, the fire suppression system did not have fusible links for each cooking appliance in the kitchen, the existing fusible links were ranked for a different system than what was in the Café, a temperature survey was not performed at each location where fusible links were installed, the make-up air system that activated when triggered by the system did not shut off as required, and the hood exhaust fans were not activated by the system.

In the morning of December 16, 2019, one of the tenants reported a fire at the Café. By the time the fire department arrived, the fire was extinguished, although there was "heat and smoke damage." A fire marshal for the City, Kelly Blaine, responded to the fire department's request for a marshal to conduct an investigation. Blaine obtained permission to hire a certified hood company to assist with the investigation and retained All American Fire Protection, Inc.

Blaine investigated the exterior and interior of the building. He documented that the range hood was not attached to the wall and "[t]he mounting bolts had completely pulled out of the wall," as had been noted in the City's September 2018 fire inspection report. He noted that where the hood duct was attached to the plenum was "to be welded and liquid tight," but that it appeared to have been sealed with silicone caulking which "melted away" during the fire.[3]

Blaine identified the fire suppression system for the hood as a "WHDR Wet Chemical Fire Suppression System made by Kidde Fire System." Blaine also reported that the fire system's mechanical detection links, or fusible links,

---

[3] Additionally, Blaine explained that the nozzle required to activate the fire suppression system was located six inches from the cooking surface, which was not compliant with the fire system. Also, the hood nozzles were pointing toward the back of the hood, when they needed to point straight up the duct.

were A-PC (Ansul/Pyro-Chemical Company) 500 degree links and were not compliant with the Kidde system, which required "ML type fusible links." Further, according to the Kidde system manual, one link will serve a continuous 54-inch by 54-inch area, but Blaine found only one fusible link for a 60-inch span that included the griddle and the four-burner range. Blaine stated that based on the burn patterns around the hood and the smoke damage, the single detector "did activate after a considerable amount of time." Blaine concluded that the fire was caused by a burner that was left on, which caused oil in a metal container to boil over onto the cooking surface. Based on the burn patterns at the point of origin, Blaine concluded the fire was accidental.

After the Whaleys filed an insurance claim, Ohio Security retained Rimkus Consulting to investigate. A Rimkus consultant, Ted Hickey, inspected the Café on December 18, 2019. Hickey reported that he spoke with one of the Café tenants, Emmanuel Martinez, who informed him that Mr. Whaley knew of the identified issues and stated that he would take care of them. Hickey spoke with Blaine, who disclosed that the fusible links on the system were incompatible with the Whaleys' system and that the make-up air system did not properly activate. Hickey explained that "[t]he lack of code compliance related to the delay and malfunction of the hood system was a contributing factor to the fire and smoke damage."

In February 2020, Ohio Security denied the Whaleys' claim. Ohio Security explained its denial was based on the following:

> The hood extinguishing system malfunctioned as a result of deficiencies that were outlined by the City of Burlington in a notice provided on September 30, 2019.
>
> Deficiencies were not repaired or adequately addressed in compliance with The City of Burlington.
>
> The condition of the hood and area surrounding, as well as information provided indicated that cleaning had not been conducted on a quarterly basis as required.
>
> We were not notified of the impairment to the scheduled protective safeguard.

Ohio Security explained that although fire is a covered cause under the policy, the Whaleys failed to meet the conditions of the Protective Safeguard because "non-compatible fusible links were installed in the ventilation hood which delayed activation and contributed to the extent of damages," and "prior to the fire [the Whaleys] were notified of the impairment to the system but failed to notify us." Further, it noted that the Whaleys had not complied with the required quarterly cleaning of the ventilation system. Therefore, it concluded that the Whaleys' policy did not cover their claim.

In November 2020, the Whaleys filed suit against Ohio Security, raising claims of breach of contract and breach of the duty of good faith and fair dealing. In February 2023, Ohio Security filed a motion for summary judgment, arguing that the Whaleys' policy included an exclusion to coverage for failure to maintain the fire suppression system and that they violated a condition for coverage because the system was non-compliant with UL 300 and NFPA 96. In April 2023, at the summary judgment hearing, the trial court explained that the "policy language is not ambiguous," and it "specifically exclude[d] coverage if there was

known non-compliance." Further, it found that "the Whaleys knew of the noncompliance, and they did not notify the insurance company." Therefore, the trial court granted summary judgment in favor of Ohio Security and dismissed the Whaleys' claims.

The Whaleys timely appeal.

DISCUSSION

The Whaleys argue that the trial court erred in granting summary judgment in favor of Ohio Security because (1) there are questions of fact about whether the fire suppression system was impaired; (2) Ohio Security should have been required to establish actual prejudice to prevail on its argument that the Whaleys failed to notify it that an inspection resulted in a "yellow tag"; and (3) Ohio Security acted in bad faith by failing to conduct a reasonable investigation before denying their claim.

We review orders granting summary judgment de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Id. at 370.

To prevail on a summary judgment motion, the moving party must show the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A "material fact" exists when such facts impact the outcome of the litigation. Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). The moving party can submit affidavits demonstrating an absence of a material issue or can demonstrate that the

nonmoving party lacks competent evidence to support an essential element of their case. Young, 112 Wn.2d at 225-26. When the moving party satisfies the initial burden, the burden then shifts to the nonmoving party to demonstrate "the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." Id. at 225. There is a genuine issue of material fact when "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Keck, 184 Wn.2d at 370. The failure to make such showing will result in the trial court granting summary judgment. Young, 112 Wn.2d at 225.

I.      Policy Coverage and Fire Suppression System Requirements

Determining whether coverage exists is a two-step process. McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 731, 837 P.2d 1000 (1992). The burden first lies with the policyholder to establish that the loss is of the type covered by the policy. Id. at 731. Then, the insurer can avoid coverage by showing that "the loss is excluded by specific policy language." Id.

In general, insurance policies are construed in the same manner as contracts. State Farm Gen. Ins. Co. v. Emerson, 102 Wn.2d 477, 480, 687 P.2d 1139 (1984). A contract must be interpreted as a whole "to give effect to each clause." Wash. Pub. Util. Dists. Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County, 112 Wn.2d 1, 10, 771 P.2d 701 (1989). The terms of the insurance policy are given " 'a fair, reasonable, and sensible construction.' " Vision One, LLC v. Philadelphia Indem. Ins. Co., 174 Wn.2d 501, 512, 276 P.3d 300 (2012) (internal quotation marks omitted) (quoting Key Tronic Corp. v. Aetna (CIGNA)

Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994)). An undefined term in the policy is given its ordinary meaning. Id. Any ambiguities in the policy are construed against the insurer. Id. However, a policy with clear and unambiguous language should be enforced without modification. Gardens Condo. v. Farmers Ins. Exch., 2 Wn.3d 832, 839, 544 P.3d 499 (2024). A court is not required to expand the interpretation of the exclusion " 'beyond [its] clear and unequivocal meaning.' " Vision One, 174 Wn.2d at 512 (quoting State Farm Fire & Cas. Co. v. Ham & Rye, LLC, 142 Wn. App. 6, 13, 174 P.3d 1175 (2007)).

Here, there is no dispute as to whether the fire damage constituted property damage, as the policy defines such loss as "[p]hysical injury to tangible property, including all resulting loss of use of that property." However, Ohio Security claims two different exclusions apply and preclude coverage. The Whaleys counter that there are questions of fact as to whether either exclusion applies.[4]

A. Failure to Notify of Impairment

The Whaleys' insurance policy had a Protective Safeguards endorsement

---

[4] As an initial matter, we reject the Whaleys' suggestion that Ohio Security is barred from asserting the exclusions by the "mend the hold" doctrine, which bars insurers from "changing the basis for avoiding liability after the onset of litigation." Karpenski v. Am. Gen. Life Cos. LLC, 999 F. Supp. 2d 1235, 1245 (W.D. Wash. 2014). The Whaleys complain that in the section "Application of Policy," the denial letter did not mention any "exclusion," but rather referred to "conditions of the protective safeguards." However, at oral argument, the Whaleys conceded that they were notified that Ohio Security was denying coverage under an exclusion. Wash. Court of Appeals oral argument, Whaley v. Alpine Fire & Safety Systems, Inc., No. 86200-6-I (Jan. 23, 2025), at 1 min., 26 sec. to 2 min., 08 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025011576/?eventID=2025011576. Indeed, in addition to the protective safeguard description, P-9, and the condition requiring protective safeguards, the denial letter quotes the two exclusions relating to the safeguards. The letter again references the exclusion, stating that "prior to the fire you were notified of the impairment of the system but failed to notify us." The Whaleys' "mend the hold" argument is unavailing.

that provided that as a condition to coverage under their policy they were "required to maintain the protective devices or services," including the following:

> "P-9", the protective system described in the Schedule. . . . [Including] [a]n automatic commercial kitchen fire suppression including hoods, plenums, exhaust ducts, and fire extinguishing equipment, over cooking appliances that is in compliance with both Underwriters Laboratories standard 300 (UL 300) and National Fire Protective Association 96 (NFPA 96). The suppression system must be inspected and serviced semi-annually by an independent contractor and the ventilating system must be cleaned quarterly by an independent contractor.

The first exclusion applies if the insured "[k]new of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify [Ohio Security] of that fact."

The Whaleys contend that the word "impairment" means a "loss of function" and that there is a genuine question of fact as to whether the system lost function, given that it ultimately worked to extinguish the fire. This argument is unavailing.

The terms of an insurance policy "are to be given their plain, ordinary and popular meaning." Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 77, 882 P.2d 703 (1994), as amended (Sept. 29, 1994). The dictionary definition of "impairment" is "the act of impairing or the state or condition of being impaired." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1131 (2002). The word "impair" can also mean "to make worse: diminish in quantity, value, excellence, or strength: do harm to: damage, (or) lessen: deteriorate." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1130 (2002).

11

Here, the exclusion specifically references impairment of "any protective safeguard listed in the Schedule." The safeguards described in P-9 include compliance with UL 300 and NFPA 96 standards. Thus, under their policy, the Whaleys were required to maintain protective systems that complied with UL 300 and NFPA 96 standards. We disagree with the Whaleys' contention that "impairment" means only "loss of function."

Next, the Whaleys argue that a question of fact exists regarding whether their fire suppression system complied with the applicable standards. Ohio Security argues that there is no question that the Whaleys' system was non-compliant given the recorded deficiencies on the pre-fire inspection reports and the Whaleys' failure to correct those deficiencies. We agree with Ohio Security.

First, Alpine Fire inspector Kilmer reported on September 18, 2019, that the fire suppression system was not UL 300 compliant. Kilmer certified the Whaleys' system with a yellow tag, meaning it was operational but noncompliant. In coming to this conclusion, Kilmer reported various deficiencies in the system, which included the improper welding of the hood vent, the make-up air vents' failure to shut down and the exhaust fans' failure to activate when the system was activated, and the insufficient number of fusible links, which also did not correspond with a Kidde system. Later that same month, on September 30, after the City conducted its annual fire safety inspection, it informed the Café of similar "concerns" with the system as Alpine Fire had noted, stating that these needed to be addressed within 30 days.

The Whaleys do not dispute that these deficiencies identified by the City existed prior to the fire. For example, when asked whether they remedied the City's identified issue with the improper sealing of the hood vent within 30 days, Brad Whaley testified that "[w]e were trying to identify someone to remedy it." Further, when prompted about the City's finding that the appliances had accumulated grease, Whaley testified that they had the tenant clean it, not the professional cleaning service, Cascade Hood Cleaning Services. Additionally, when asked whether they followed up with Alpine Fire about remedying the deficiencies identified by the City, Whaley testified, "I took it straight to . . . Alpine [Fire] and went through it. . . . we had agreed that these things would be remedied, but I don't believe they happened before the fire occurred." Thus, even though the Whaleys assert they were not responsible for remedying the identified deficiencies, they acknowledge that their system had deficiencies and provide no evidence to the contrary.

Nevertheless, the Whaleys claim that a reasonable trier of fact could determine that the "yellow tag" marking for their system indicated that it was normal and, as such, the Protective Safeguards endorsement did not apply. They point to testimony from the fire marshal, Blaine, who was asked whether a system marked with a yellow tag indicated that "the system was fine." But a more complete reading of the record demonstrates that he replied, "Yes. If they (Alpine Fire) noted it that there was deficiencies and we looked at it, went out and inspected it and noticed those were the deficiencies that we saw, yes, that would be normal." Blaine's testimony preceding and following that statement was about

an ongoing issue in the area where systems were marked with yellow tags despite having deficiencies that should have prompted red tag markings. Blaine went on to explain that a yellow tag does not mean the system is "fine" or "normal" but rather that it will function with deficiencies that may render it non-compliant. Ohio Security's investigator, Hickey, similarly testified that a yellow tag certification implies that while a system is operational, meaning it will function to extinguish a fire, it is in need of correction.

The Whaleys also did not comply with the provision in the Protective Safeguards that required them to have the system "inspected and serviced semi-annually by an independent contractor" and the ventilating system "cleaned quarterly by an independent contractor." Records from Alpine Fire indicate that the Whaleys' system was serviced only three times between 2017 and the date of the fire in December 2019. And records from the Whaleys' cleaning service, Cascade Hood Cleaning Services, show that the system was cleaned only once in 2019. Thus, the Whaleys' system was not compliant with the cleaning and servicing schedule that was a condition of their policy.

The Whaleys also suggest that there must be a causal connection between the yellow tag notices and the fire loss. But the plain language of the exclusion contains no such requirement.[5] Moreover, the cases the Whaleys cite in support do not require a causal connection for a policy exclusion to apply, where the exclusion contains no such requirement. Metropolitan Club v. Massachusetts Bonding & Insurance Co., did not involve a policy exclusion but a

---

[5] Further, as Ohio Security notes in its briefing, "[w]hile a system might fail to partially or fully extinguish a fire because of deficiencies, it doesn't cause the fire."

14

bond to secure against any loss by larceny or embezzlement by an employee. 127 Wash. 320, 324-25, 220 P. 818 (1923). There, a club sued the surety company when its employee embezzled money. Id. at 323. To procure the bond, the insurer had asked for certain information about how the club would maintain oversight of the bonded employee. Id. at 324-26. The court reversed the trial court's judgment notwithstanding the verdict dismissing the surety, determining that there was a triable issue regarding whether the club's statements to procure the bond were false and the promised oversight was performed by the club. Id. at 325, 329. The Whaleys' interpretation—that Metropolitan Club requires a causal connection between the reporting requirement and the loss—implies far more than is actually reflected in the court's decision.

The aviation insurance cases from other jurisdictions that the Whaleys cite are also inapposite as they relied on state-specific law outside of Washington. In Puckett v. U.S. Fire Insurance Co., the issue was "whether an insured's failure to have his plane inspected need be the cause of an accident in order for the insurance company to avoid liability under an aviation policy for damages resulting from that accident." 678 S.W.2d 936, 937, 48 A.L.R.4th 769 (1984). The policy suspended coverage "if the aircraft . . . airworthiness certificate is not in full force and effect," which, under federal law, meant that all maintenance requirements had been met, including an annual inspection. Id. It was undisputed that no such inspection had been performed, but also that the failure to inspect in no way caused the accident. Id. The court held that the policy required no causal connection between the breach of the policy and the accident, but nevertheless,

the clause as interpreted violated the state's public policy and was unconscionable. Id. at 938. Likewise, in Pickett v. Woods, the liability policy for an aircraft contained an exclusion for an insured "unless its airworthiness certificate is in full force and effect." 404 So.2d 1152 (Fla. Dist. Ct. App. 1981). A Florida law required that any breach by the insured of a transportation insurance policy would not allow an insurer to avoid coverage unless the related breach " 'increased the hazard by any means within the control of the insured.' " Id. at 1152-53 (quoting Fla. Stat. Ann. § 627.409 (1979)). As it was undisputed that pilot error was the only cause of the accident, the court remanded for trial on the issue of whether the failure of the aircraft to be properly certified increased the hazard. Id. at 1153.

The applicable policy language here is clear and excludes coverage if the insured "[k]new of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify [Ohio Security] of that fact." It is undisputed that the Whaleys were aware of deficiencies in their fire suppression system based on inspections by the City and Alpine Fire and did not notify Ohio Security despite the notice provision in the Protective Safeguards. Thus, the court properly held the loss was excluded under the first exclusion.

B. <u>Failure to Maintain Protective Safeguard in Complete Working Order</u>

Alternatively, a second provision in the Whaleys' policy excludes a loss from coverage if the insured "[f]ailed to maintain any protective safeguard listed in the Schedule above, and over which [the insured] had control, in complete working order." The Whaleys argue that questions of fact remain about whether

16

their fire suppression system was "in complete working order," because it did put out the fire. Again, we disagree.

In Ohio Security's coverage denial letter to the Whaleys, it explained that although fire was a covered cause of loss,

> it has been established that you have not met the conditions of the protective safeguards. It was determined that non-compatible fusible links were installed in the ventilation hood which delayed activation and contributed to the extent of the damages. . . . In addition, the condition of the hood and surrounding appliances at the time of the loss do not support that quarterly cleaning of the ventilation system occurred as required in your protective safeguards endorsement.

Further, the denial letter specifically noted that "the hood extinguishing system malfunctioned as a result of deficiencies that were outlined by the City of Burlington in a notice provided on September 30, 2019." The Whaleys claim that despite these deficiencies, their fire suppression system was in "complete working order" because it functioned to put out the fire, so the exclusion did not apply.

To counter the Whaleys' argument, Ohio Security relies on United Specialty Insurance Co. v. Shot Shakers, Inc., which involved a policy with the same protective safeguards and exclusions as here. C18-0596JLR, 2019 WL 199645 (W.D. Wash. Jan. 15, 2019), aff'd, 831 Fed. App'x 346 (9th Cir. 2020). In Shot Shakers, both parties sought partial summary judgment on the issue of whether failure to comply with the protective safeguards precluded coverage. 2019 WL 199645 at *5. The policy excluded coverage for "fail[ing] to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." Id. at *11. The court concluded that "[a] fire

17

suppression system that does not comply with the Safeguards Condition cannot be in 'complete working order' for purposes of the Safeguards Exclusion." Id. at *12. Thus, "[a] deficient system is not in 'complete working order.' " Id.

The Whaleys contend that Shot Shakers is factually dissimilar because there, the policyholder continuously made misrepresentations,[6] the fire suppression system did not have nozzles above one of the kitchen appliances, the origin of the fire was accumulated grease in the suppression system itself, and there was not enough extinguishing substance to put out the fire. See 2019 WL 199645 at *4. Here, they argue, the system functioned as intended because the fire suppression had nozzles over the appliance that activated, the fire did not start in the suppression system, and the system functioned to extinguish the fire as intended. The Whaleys also highlight that the investigations by the City and Ohio Security did not establish that the fire suppression system delayed in activating or that it caused more damage. They point to Blaine's statement that it was not definitively known how long the fire burned based on the burn pattern and that he did not follow the NFPA 921 Guide for Fire and Explosion Investigations before issuing his report.[7] However, even if the types of deficiencies in Shot Shakers and this case were different, the Whaleys do not dispute that their fire suppression system did not comply with the Protective Safeguards condition. Shot Shakers involved precisely the same type of

---

[6] The policy in Shot Shakers specifically included a provision not present in the Whaley's policy that excluded coverage if the insureds made misrepresentations in their application for coverage. 2019 WL 199645 at *2-3.

[7] On the other hand, Ohio Security's consultant, Hickey, noted in his report to Ohio Security that he used the NFPA 921 guide.

exclusion,[8] and we follow its sound reasoning that "[a] fire suppression system that does not comply with the Safeguards Condition cannot be in 'complete working order' for purposes of the Safeguards Exclusion." 2019 WL 199645 at *12.

The Whaleys rely on Hernandez & Nunez, Inc. v. Penn-American Insurance Co., to support their argument that when a system functions as intended, the lack of compliance with protective safeguards should not defeat coverage. CV 18-4192 AS, 2019 WL 1423770, at *7 (C.D. Cal. Feb. 15, 2019). But in Hernandez & Nunez, the system *was* in working order, as required by the policy, 2019 WL 1423770 at *7, whereas here, the pre-fire reports noted that the Whaleys' system was deficient and not in "complete working order."

Also, the Hernandez & Nunez court treated the protective safeguards endorsement as a condition precedent to coverage rather than as an exclusion from coverage. Id. at *6, *10. Thus, the Whaleys also argue that as in Hernandez & Nunez, "Washington also applies a substantial compliance standard when addressing policy conditions." But other than Hernandez & Nunez, the only authority they cite for this proposition is Staples v. Allstate Insurance Co., a case involving a cooperation clause as a condition of coverage. 176 Wn.2d 404, 414, 295 P.3d 201 (2013). We decline to read a substantial compliance standard into the policy exclusion in this case. Therefore, we conclude that there is no triable issue of fact as to whether the second exclusion applies to the Whaleys' claim.

---

[8] Under GR 14.1(c), we may cite to unpublished decisions as necessary for a reasoned opinion, as is the case here.

II.     Showing of Prejudice

The Whaleys assert that even if the Protective Safeguards endorsements are conditions of coverage, Ohio Security nonetheless had to prove that it was prejudiced by their failure to satisfy those conditions to prevail at summary judgment. Ohio Security counters that it is not required to demonstrate prejudice regarding "an exclusion with a notice requirement" and that the Whaleys' failure to notify it satisfies the elements of the exclusions.

In general, exclusionary clauses are narrowly construed "for the purpose of providing maximum coverage for the insured." George v. Farmers Ins. Co. of Wash., 106 Wn. App. 430, 439, 23 P.3d 552 (2001). However, "[w]e will uphold exclusions that rationally limit the risks of the insurer." Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 288 n.15, 313 P.3d 395 (2013).

On the other hand, conditions to coverage in an insurance policy are used to "prevent the insurer from being prejudiced by the insured's actions," as "releas[ing] an insurer from its obligation without a showing of actual prejudice would be to authorize a possible windfall for the insurers." Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 803, 881 P.2d 1020 (1994). Thus, in some post-loss contexts, an insurer cannot avoid coverage unless it can show it "suffered prejudice from its insured's breach." Tran v. State Farm Fire & Cas. Co., 136 Wn.2d 214, 228, 961 P.2d 358 (1998).[9] Courts generally analyze prejudice when there is a clause that "designate[s] the manner in which claims

---

[9] Actual prejudice means " 'affirmative proof of an advantage lost or disadvantage suffered as a result of the [breach]' " that detrimentally affects the insurer's ability to defend against coverage. Tran, 136 Wn.2d at 228-29 (quoting Canron, Inc. v. Fed. Ins. Co., 82 Wn. App. 480, 491, 918 P.2d 937 (1996), review denied, 131 Wn.2d 1002, 932 P.2d 643 (1997)).

covered by the policy are to be handled *once a claim has been made* or *events giving rise to a claim have occurred*." Pub. Util. Dist. No. 1, 124 Wn.2d at 803. For example, courts commonly apply a prejudice analysis with cooperation, notice, and no-settlement clauses, but do not "analyze prejudice in cases involving types of clauses other than those involving the handling of claims." Pilgrim v. State Farm Fire & Cas. Ins. Co., 89 Wn. App. 712, 723-24, 950 P.2d 479 (1997). See also Shot Shakers, 2019 WL 199645 at *11 (the protective safeguards in the policyholder's policy did not deal with "late notice, failure to cooperate, voluntary payment or other claims handling clause[s]" that would require the insurer to show it was prejudiced by the policyholder's breach—i.e., noncompliance with the conditions to coverage).

The Whaleys do not provide authority that a showing of actual prejudice is required outside of those contexts. For example, in Tran, 136 Wn.2d at 217-19, the policyholder, whose business was burglarized, refused to produce financial records related to his claim, in violation of the policy's cooperation clause; the court held that as a result, the insurer was actually prejudiced because it was prevented from determining the validity of his claim. Canron, Inc. v. Federal Insurance Co., involved a notice clause that required the policyholder to give the insurer notice of any unanticipated "occurrence[s]" resulting in damage; the court held that the insurer was not actually prejudiced because it identified only "possible detriments" resulting from the policyholder's year-long delay in notifying the insurer of potential liability for contamination of soil and groundwater. 82 Wn. App. 480, 483, 486, 488, 918 P.2d 937 (1996). And Griffin v. Allstate Insurance

21

Co., involved the breach of a condition prohibiting the policyholder from making voluntary payments in the event of bodily injury or property damage to be relieved of its duty to defend. 108 Wn. App. 133, 141-42, 29 P.3d 777 (2001).

Rather, courts have declined to require the insurer to show prejudice before declining coverage when a policyholder fails to provide pre-loss notice of risk. For example, in Safeco Title Insurance Co. v. Gannon, the court held that actual prejudice was not required for claims involving termination clauses, reasoning that otherwise the insurer could be required to provide coverage "the insurer did not intend"—i.e., a claim might be covered if the policyholder submitted "notice of 'facts and circumstances' " that may result in subsequent claims prior to the expiration of the claims period. 54 Wn. App. 330, 334, 339, 774 P.2d 30 (1989). And in Simms v. Allstate Insurance Co., the court concluded that a finding of prejudice is unnecessary for a statute of limitations clause because it is merely a contractual modification. 27 Wn. App. 872, 876-77, 621 P.2d 155 (1980).

Here, the Protective Safeguards endorsements in the policy did not impose a notice condition relating to the presentation of a claim, but rather required notice of an impairment of one of the identified safeguards. This notice does not implicate Ohio Security's handling of claims or duty to defend. Rather, the failure to notify Ohio Security of an impairment itself resulted in the exclusion from coverage. On these facts, we conclude that Ohio Security was not required to show actual prejudice caused by the Whaleys' failure to comply with the protective safeguards in order for the policy exclusion to apply.

III.     Duty of Good Faith and Fair Dealing

The Whaleys assert that Ohio Security acted in bad faith in denying their claim because if Ohio Security had conducted a "balanced analysis of the case law," it would have discovered authority that supported coverage and challenged the applicability of the exclusion. This argument is unavailing.

All contracts convey an implied duty of good faith and fair dealing. Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty extends to insurance policies. Coventry Assocs. v. Am. States Ins. Co., 136 Wn.2d 269, 281, 961 P.2d 933 (1998). To comply with this duty, an insurer must timely conduct any necessary and reasonable investigation before denying coverage. Id. In general, good faith is a question of fact, but "it may be resolved on summary judgment where no reasonable minds could differ on the question." Marthaller v. King County Hosp. Dist. No. 2, 94 Wn. App. 911, 916, 973 P.2d 1098 (1999).

The Whaleys claim that here, Ohio Security did not properly complete a "balanced analysis of the case the law" because a thorough review would have demonstrated that "the law treats a total failure or absence of a system differently than alleged defects in an operational fire suppression system." In support of their argument, the Whaleys cite to American Best Food, Inc. v. Alea London, Ltd., in which the court held the insurer acted in bad faith as a matter of law because it failed to uphold its duty to defend "based upon a questionable interpretation of law." 168 Wn.2d 398, 412-13, 229 P.3d 693 (2010). The Whaleys also point to Robbins v. Mason County Title Ins. Co., in which the

23

insurer refused to defend the policyholder based on its own interpretation of an undecided area of law. 195 Wn.2d 618, 634-35, 462 P.3d 430 (2020).

Ohio Security contends its analysis of the law did not breach the duty of good faith because the cases on which the Whaleys rely, American Best Food and Robbins, pertained only to the duty to defend. As the first party property claim in this case does not involve the duty to defend, Ohio Security argues that it was not obligated to consider cases involving that duty.

We agree with Ohio Security. The fact that Ohio Security did not rely on inapposite caselaw does not establish bad faith.

Further, the Whaleys argue that questions of fact exist regarding whether Ohio Security conducted "all reasonable and necessary investigations" as required by Coventry before denying their claim. They contend there was "no evidence" to prove that the hood malfunctioned; that if the fusible links were not the correct rating for the Kidde system, the "investigation revealed none of the investigators knew what the real temperature rating should have been"; and that Ohio Security failed to perform system tests and denied coverage before the Fire Marshal released its final report.

Ohio Security argues that the Whaleys waived this argument about the efficacy of their investigation because they did not raise it below.[10] In general, a reviewing court need not consider arguments a party did not raise before the trial court, but may exercise discretion "to consider newly-articulated theories" of an

---

[10] Ohio Security briefly addresses the merits of this argument in a footnote, explaining that its investigation was proper because it "inspected the loss, hired a cause and origin expert, interviewed the Fire Marshal and obtained his pre-fire inspection, and interviewed Mr. Whaley."

issue addressed by the trial court. Cave Properties v. City of Bainbridge Island, 199 Wn. App. 651, 662, 401 P.3d 327 (2017).

Even if it were not waived, the Whaleys' argument fails on the merits. The record demonstrates that Ohio Security conducted a reasonable investigation before denying the Whaleys' claim in good faith. Ohio Security promptly hired Rimkus Consulting, a third-party firm to investigate the fire. Rimkus's inspector, Hickey, conducted his investigation on December 18, two days after the fire. Hickey spoke with the Whaleys' tenant, Emmanuel Martinez, inspected the Café, met with Blaine, the Fire Marshal, and determined a cause of the fire. Further, Ohio Security obtained the pre-fire inspection by the City, which detailed deficiencies in their system. The Whaleys identify no additional evidence that would have resulted in a different conclusion on the facts relevant to the policy exclusions.

Viewing the evidence in the light most favorable to the Whaleys, we hold that no reasonable juror could conclude that Ohio Security acted in bad faith in denying the Whaleys' claim.

CONCLUSION

We affirm the trial court's summary judgment dismissal of the Whaleys' claims.

_Chung, J._

WE CONCUR:

_Feldman, J._          Díaz, J.